UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
DOUGLAS COX,

                          Plaintiff,

                    -against-

DEPARTMENT OF JUSTICE, *et al.*,

                         Defendants.
---------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
17-CV-3329 (RRM) (RLM)

ROSLYNN R. MAUSKOPF, Chief United States District Judge.

       Plaintiff Douglas Cox brings this action pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, claiming that defendants Department of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), Department of Defense ("DOD"), Office of the Director of National Intelligence ("ODNI"), and Department of State ("State" or "State Department"), (collectively, "the Agencies"), are improperly withholding records responsive to Cox's FOIA requests for records relating to the Senate Select Committee on Intelligence's ("SSCI") *Study of the Central Intelligence Agency's Detention and Interrogation Program* ("SSCI Report"). The Agencies now move to dismiss Cox's complaint with respect to his requests for versions of the SSCI Report, arguing that the report is not an agency record subject to FOIA. The Agencies also move for summary judgment with respect to Cox's remaining requests, arguing that they have, among other things, properly withheld documents pursuant to FOIA exemptions. For the reasons set forth below, the Agencies' motion to dismiss is denied and the Agencies' motion for summary judgment is granted in part and denied in part.

# BACKGROUND

## I.  FOIA

FOIA requires that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . , shall make the records promptly available to any person."  5 U.S.C. § 552(a)(3)(A).  Under this provision,

> the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, . . .  has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant.

5 U.S.C. § 552(a)(4)(B).

In any FOIA case, the Court must bear in mind that FOIA was drafted to promote disclosure of governmental information.  *See Fed. Labor Relations Auth. v. U.S. Dep't of Veterans Affairs*, 958 F.2d 503, 508 (2d Cir. 1992) ("In interpreting FOIA, it must be remembered that the statute seeks to permit access to official information long shielded unnecessarily from public view, and was intended to establish a general philosophy of full agency disclosure." (internal quotation marks and citations omitted)).  At the same time, the statute enumerates exemptions, which serve "to protect specified confidentiality and privacy interests."  *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 220–21 (1978).  These exemptions are the primary means by which an agency may avoid production of records subject to FOIA; "unless the requested material falls within one of these nine statutory exemptions, FOIA requires that records and material in the possession of federal agencies be made available on demand to any member of the general public."  *Id.* at 221.  If a requestor believes an agency improperly withheld records subject to disclosure under FOIA, the requestor "may seek an order of production from a district court, which will review the matter *de novo*, placing the burden on

the agency to defend its non-disclosure decisions." *Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 544 (2d Cir. 2016) (citing 5 U.S.C. § 552(a)(4)(B)).

## A.  Relevant Exemptions

FOIA exemption one exempts from disclosure matters that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 551(b)(1).

FOIA exemption five exempts from disclosure matters that are "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  "The exemption incorporates all normal civil discovery privileges, including the deliberative process privilege, the attorney-client privilege, and the attorney work product privilege."  *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 811 F. Supp. 2d 713, 734–35 (S.D.N.Y. 2011) (quotation marks omitted), *amended on reconsideration* (Aug. 8, 2011).

## B.  Vaughn index

In *Vaughn v. Rosen*, the D.C. Circuit held that agencies must provide more than "conclusory and generalized allegations of exemptions," but rather "relatively detailed analysis in manageable segments" explaining the basis for their claimed exemptions. 484 F.2d 820, 826 (D.C. Cir. 1973).  Consistent with this obligation, an agency will use a "*Vaughn* index" and/or a "*Vaughn* affidavit" to outline its claimed exemptions.  A district court may grant summary judgment to an agency based on its affidavits only if they provide a "*reasonable specificity* of detail rather than merely conclusory statements" supporting the agency's withholding of records. *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999).  "While there is no set

form for a *Vaughn* index, the agency should describe the documents with as much information as possible without thwarting the exemption's purpose" and "provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Navigators Ins. Co. v. Dep't of Justice*, 155 F. Supp. 3d 157, 171 n.13 (D. Conn. 2016).  Given its purpose, the Second Circuit has explained that a *Vaughn* affidavit should provide a "fact-specific justification that either (a) would permit appellant to contest the affidavit in adversarial fashion, or (b) would permit a reviewing court to engage in effective *de novo* review of the [withheld] information."  *Halpern v. F.B.I.*, 181 F.3d 279, 293 (2d Cir. 1999).  The level of specificity required also depends in part on the exemption claimed.  For instance, "[u]nder Exemption 1, it makes sense to require itemized descriptions of documents and/or redactions in the government's *Vaughn* affidavits since these descriptions are likely to have a direct bearing on the types of information contained in the document that are subject to redaction."  *Halpern*, 181 F.3d at 297.

### C.  Partial Disclosures

Finally, FOIA provides, "Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).  "This provision requires agencies and courts to differentiate among the contents of a document rather than to treat it as an indivisible 'record' for FOIA purposes."  *F.B.I. v. Abramson*, 456 U.S. 615, 626 (1982).  That said, agencies need not disclose non-exempt information that is "inextricably intertwined" with exempt information.  *See Hopkins v. U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 85 (2d Cir. 1991).  Information is "inextricably intertwined" where "disclosure would compromise the confidentiality of [exempt

information that is entitled to protection." *Id.* (citation and internal quotation marks omitted); *see also Am. Civil Liberties Union v. United States Dep't of Justice*, 252 F. Supp. 3d 217, 227 (S.D.N.Y. 2017). A district court is required to "make specific findings of segregability regarding the documents to be withheld." *Color of Change v. United States Dep't of Homeland Sec.*, 325 F. Supp. 3d 447, 455 (S.D.N.Y. 2018) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007)); *see also Hopkins*, 929 F.2d at 85 (remanding for district court to make specific findings as to whether factual data could be segregated in record withheld pursuant to exemption five deliberative process privilege). Although it is the agencies' burden to establish that they properly segregated information, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman*, 494 F.3d at 1117; *see also Navigators Ins. Co.*, 155 F. Supp. 3d at 174.

## II.    Relevant Facts

The facts below are drawn from Cox's complaint, as well as documents and declarations submitted by the parties. Unless otherwise noted, the facts are undisputed.

### A.    The SSCI Report

In March 2009, the SSCI informed the Central Intelligence Agency ("CIA") that it planned to review the CIA's former detention and interrogation program. (Declaration of Antoinette B. Shiner ("Shiner Decl.") (Doc. No. 52-2), Attachment 1 ("Higgins Decl.") ¶ 10.) To this end, the SSCI requested access to CIA documents regarding the program. (Higgins Decl. ¶ 10.) According to former CIA Director of Congressional Affairs Neal Higgins, "Due to the volume and the highly sensitive and compartmented nature of the classified information at issue, the CIA determined that in order to properly safeguard classified equities, the SSCI's review of Agency records would need to take place at CIA facilities." (*Id.*)

5

### 1. June 2009 Letter

In a June 2, 2009, letter, the SSCI wrote to then-CIA Director Leon Panetta regarding the planned review of records at the CIA.  (Higgins Decl., Ex. D ("June 2009 Letter"); *see also* Plaintiff's Brief in Opposition ("Opp.") (Doc. No. 52-10), Ex. N (same).)  The letter outlined "procedures and understandings" under which the SSCI and its staff would conduct its review. (June 2009 Letter at 1.)  The letter discussed the documents that would be provided, protections for computers used by SSCI staff, and – most significantly, for the purposes of the instant action – SSCI's control over notes, documents, reports, and other materials generated by SSCI staff. Quoting the relevant portion in full:

> Any documents generated on the network drive referenced in paragraph 5, as well as any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee and will be kept at the Reading Room solely for secure safekeeping and ease of reference.  These documents remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee.  As such, these records are not CIA records under the Freedom of Information Act or any other law.  The CIA may not integrate these records into its records filing systems, and may not disseminate or copy them, or use them for any purpose without the prior written authorization of the Committee.  The CIA will return the records to the Committee immediately upon request in a manner consistent with paragraph 9.  If the CIA receives any request or demand for access to these records from outside the CIA under the Freedom of Information Act or any other authority, the CIA will immediately notify the Committee and will respond to the request or demand based upon the understanding that these are congressional, not CIA, records.

(June 2009 Letter at 2–3.)

The parties disagree about the meaning and effect of this letter.  According to the Agencies, "Before the review commenced, the Senate Committee and officials at the CIA negotiated arrangements to deal with access to classified materials by Senators and their staff, and agreed on rules regarding the Committee's control over its work product."  (Mem. of Law in

Sup. of Defs' Mot. to Dismiss and for Summ. J. ("Mot.") (Doc. No. 52-1) at 12.)[1]  The Agencies

maintain that the June 2009 letter "memorialized" these "arrangements." (*Id.*)  Cox, on the other

hand, denies that the June 2009 Letter memorialized any agreement between the SSCI and the

CIA.  (Opp. at 24.)  According to Cox, the June 2009 Letter was "superseded by subsequent

negotiations back and forth between the CIA and SSCI that apparently came to an uncertain

end." (*Id.*)  Cox also argues that the above-quoted paragraph of the June 2009 Letter applied

only to SSCI records "on hard drives within a CIA Reading Room," and not to versions of the

SSCI Report transmitted to the CIA, versions of the SSCI Report transmitted to other agencies,

or to the SSCI's review of other agencies' records.  (Opp. at 23–25.)

### 2.    December 2012 Letter and Report

On December 13, 2012, the SSCI voted to approve an initial version of its full report,

including an executive summary.  (*See* Declaration of Vanessa R. Brinkmann ("Brinkmann

Decl.") (Doc. No. 52-3), Ex. N ("December 2012 Letter"); *see also* Compl. ¶¶ 13–14; Opp., Ex.

F (same).)  In a December 14, 2012, letter to President Obama, SSCI Chairman Senator Dianne

Feinstein explained that the "6,000 page report, complete with executive summary, findings, and

conclusions" would be provided to the President and "appropriate Executive Branch agencies."

(December 2012 Letter at 1.)  Senator Feinstein requested "that the White House coordinate any

response from these agencies, and present any suggested edits or comments to the Committee by

February 15, 2012 [sic]." (*Id.*)  "After consideration of these views," Senator Feinstein added, "I

intend to present this report with any accepted changes again to the Committee to consider how

to handle any public release of the report, in full or otherwise." (*Id.*)  The parties agree that at

---

[1] Page numbers for the parties' briefs correspond to pagination assigned by the Court's Electronic Case Filing system.

least some of the Agencies first received copies of the SSCI Report in December 2012. (Mot. at 13; Opp. at 10; Compl. ¶¶ 14–15 (DOJ), 60–61 (FBI), 87 (ODNI), 102 (State Department).)

The parties disagree about how to characterize the 6,000-page report, including executive summary, that was approved and transmitted to the Executive Branch in December 2012 (the "December 2012 SSCI Report"). The Agencies describe the December 2012 SSCI Report and its executive summary as two distinct "drafts," sent to the Executive Branch "for review, soliciting suggested edits or comments but limiting dissemination to specific individuals identified in advance to the Chairman." (Mot. at 13.) According to Cox, the December 2012 SSCI Report was "the *approved* Dec. 2012 version of the full *Study*" and "[w]hile the term 'draft' might be useful shorthand," it is "factually inaccurate and inconsistent with how Congress and the agencies . . . treated" the December 2012 SSCI Report. (Opp. at 9–10.) Cox further disputes that the executive summary constituted a "stand-alone" document as the Agencies contend, arguing instead that it was part of "a cohesive whole." (Mot. at 13; Opp. at 10 n.6.)

### 3.    April 2014 Letter and Report

The parties agree that in April 2014, the SSCI approved an updated version of its report, (the "April 2014 SSCI Report") and transmitted it to at least some of the Agencies. (Mot. at 13–14; Opp. at 13; Compl ¶¶ 17–18 (DOJ), 62 (FBI), 89–90 (ODNI).) In an April 7, 2014, letter to President Obama, Senator Feinstein stated that the SSCI had "voted to send for declassification the Findings and Conclusions and Executive Summary of an updated version of the Committee's Study of the CIA's Detention and Interrogation Program." (Brinkmann Decl., Ex. L ("April 2014 Letter") at 1; *see also* Compl. ¶ 16; Opp., Ex. G (same).) Feinstein explained, "This full report should be considered as the final and official report from the Committee," adding that she "encourage[d] and approve[d] the dissemination of the updated report to all relevant Executive

Branch agencies, especially those who were provided with access to the previous version."
(April 2014 Letter at 1–2.)

### 4.      December 2014 Letter and Report

The parties agree that in December 2014, the SSCI sent another version of the SSCI Report, ("December 2014 SSCI Report"), to the Agencies.  (Mot. at 14; Opp. at 12; Compl. ¶¶ 24 (DOJ), 63–64 (FBI), 73 (DOD), 92–93 (ODNI), 104–05 (State Department).)  In a December 10, 2014, letter to President Obama, Senator Feinstein wrote that, the day prior, the SSCI "formally filed the full version of its Study of the Central Intelligence Agency's Detention and Interrogation Program with the Senate and publicly released the declassified Executive Summary and Findings and Conclusions, as well as the declassified additional and minority views." (Brinkmann Decl., Ex. M ("December 2014 Letter"); Opp., Ex. J (same).)  According to the Agencies, this report was based on the SSCI's review of "comments and proposed edits from the Executive Branch" following the April 2014 SSCI Report.  (Mot. at 14.)  Cox characterizes the December 2014 differently, contending that the December 2014 SSCI Report incorporated "'declassification revisions' that essentially 'dumbed down' portions of the *Torture Study's* Executive Summary in order to maximize public disclosure" and preserve the Committee's narrative and conclusions following the executive branch's redactions.  (Opp. at 13.)

At the end of the December 2014 Letter, Senator Feinstein wrote,

[T]he full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated.  To help achieve that result, I hope you will encourage use of the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees, as you see fit.

December 2014 Letter at 1.

After the transmittal of the December 2014 SSCI Report, Yahoo News reported that the CIA had deleted and destroyed copies of the SSCI Report it had received.  (*See* Opp., Ex. S.)  In emails to DOJ, SSCI staff stated that they had reason to believe the CIA had deleted and destroyed its copies of the SSCI Report in response to guidance from DOJ to the CIA Inspector General.  (*Id.*)  Cox includes with his motion partially redacted emails that appear to discuss the CIA's loss of the SSCI Report and that suggest that the CIA Inspector General's office was involved in events leading up to the loss of the report.  (*See* Opp., Exs. T, U, V (Doc. Nos. 30–32).)

### 5.    January 2015 Letters

In January 2015, Senator Richard Burr took over as chairman of the SSCI.  In a January 14, 2015, letter to President Obama, Senator Burr wrote that he considered the December 2014 SSCI Report "to be a highly classified and committee sensitive document" and "request[ed] that all of copies of the full and final report in the possession of the Executive Branch be returned immediately to the Committee."  (Brinkmann Decl., Ex. J ("January 2015 Senator Burr Letter").)  In a January 16, 2015, letter to President Obama, Senator Feinstein, then Vice Chairman of the SSCI, wrote that she "d[id] not support this request" in Senator Burr's letter and that she "believe[d] it is important for appropriately cleared individuals in the Executive Branch to have access to the Committee's full, classified report."  (Mot., Ex. 7 ("January 2015 Senator Feinstein Letter") (Doc. No. 52-8) at 1.)

### 6.    May 2017 Letter

On May 30, 2017, Senator Burr again requested that the Agencies return their copies of the December 2014 Report.  (Opp., Ex. X (Doc. No. 52-34).)  The parties agree that in response to this request at least some of the Agencies returned copies of the SSCI Report to the SSCI.

(Opp. at 35–37; Reply at 34; Compl. ¶ 3.)  Cox includes with his motion an email response to Senator Burr's request from ODNI Director of Legislative Affairs Dierdre Walsh that suggests DOJ was potentially consulted on the Agencies' obligations to retain records before the decision to return the SSCI Report copies was made.  (Opp., Ex. X.)  Although they do not specifically deny that DOJ was consulted, the Agencies state that Cox is merely "speculat[ing]" in his claim, described in more detail below, that the Agencies may have returned copies of the SSCI Report based on DOJ guidance.  (Reply at 34.)

## B.    Cox's FOIA Requests and the Agencies' Responses

On December 21, 2016, Cox submitted FOIA requests to the Department of Justice ("DOJ"), the Federal Bureau of Investigation ("FBI"), the Department of Defense ("DOD"), the Office of the Director of National Intelligence ("ODNI"), and the Department of State ("State" or "State Department"), seeking copies of the SSCI Report and related documents.  (Compl. ¶¶ 45, 66, 81, 95, 107; Brinkmann Decl., Ex. A ("DOJ FOIA Request"); Declaration of David M. Hardy ("Hardy Decl.") (Doc. No. 52-4), Ex. A ("FBI FOIA Request"); Declaration of Deirdre Walsh ("Walsh Decl.") (Doc. No. 52-5), Ex. A ("ODNI FOIA Request"); Declaration of Mark H. Herrington ("Herrington Decl.") (Doc. No. 52-6), Ex. A ("DOD FOIA Request"); Declaration of Eric F. Stein ("Stein Decl.") (Doc. No. 52-7), Ex. B ("State Department FOIA Request").)

### 1.    DOJ

In his request to DOJ, Cox sought specific final copies of the SSCI Report (Request Nos. 1–2); any other copies of the SSCI Report, including "portions . . . that have been cut and pasted into, or quoted in, other Department of Justice documents," (Request No. 3); draft copies of the SSCI Report, (Request No. 4); "records, documents, or non-record material discussing or referencing any copies of the final or draft *SSCI Report on Torture*," (Request No. 5);

communications between various agencies, government officials, and members of Congress "regarding how the Department of Justice or these other entities should handle or treat copies of either the draft or final *SSCI Report on Torture*," (Request No. 6); "records, documents, or non-record material that discuss or describe when, why and/or under what circumstances the 'DOJ copy of the Full Report' was marked 'Congressional Record,'" (Request No. 7); and a "copy of the letter from Senator Feinstein to the President that was 'assigned an agency tracking number' and references the SCSI Report on Torture 'as a classified attachment to the letter'" (Request No. 8).  On February 24, 2017, DOJ denied requests one through four of Cox's FOIA request, stating that the SSCI Report was not an "agency record," that it would need more time to search for records responsive to requests five through seven, and that it had located documents responsive to request eight.  (*See* Brinkmann Decl. ¶ 4, Ex. B.)  Cox appealed DOJ's response to his requests, but the decisions with respect to requests one through seven were affirmed, and DOJ deferred ruling on the eighth request because its search was ongoing.  (*See* Brinkmann Decl. ¶¶ 7–8, Exs. E, F.)

In a February 2, 2018, letter, DOJ's Office of Information Privacy ("OIP") informed Cox that it had located 368 pages containing records responsive to his request, withheld 333 pages pursuant to FOIA exemption five, and produced 35 pages with redactions pursuant to exemptions three, five and six.[2]  (Brinkmann Decl., Ex. G.)  In her declaration filed with this motion, Senior Counsel at the DOJ's Office of Information Privacy Vanessa R. Brinkmann states that upon further review OIP released 10 more pages of the withheld documents with some redactions pursuant to exemptions five and six, and identified some duplicate pages, reducing the total pages withheld in full to 320.  (Brinkmann Decl. ¶ 10.)

---

[2] The letter noted that portions of the 333 pages withheld in full were also exempt pursuant to exemptions three and six.  (Brinkmann Decl., Ex. G.)

Regarding the exemption five withholdings, Brinkmann organizes the documents withheld into categories and in subsequent paragraphs describes the basis for withholding each of these categories pursuant to exemption five.  (*Id.* ¶¶ 39–82.)  DOJ's exemption five withholdings were made based on the deliberative process privilege, attorney-client privilege, and attorney work product doctrine.  (Brinkmann Decl.  ¶¶ 42, 51, 56.)  These withholdings are further supported by a *Vaughn* index included with Brinkmann's declaration describing the documents for which DOJ asserts exemptions.  (Brinkmann Decl., Ex. P.)  Finally, Brinkmann describes OIP's efforts to release segregable information in withheld and redacted records.  (*Id.* ¶¶ 83–87.)

DOJ performed a supplemental search and, during the pendency of this motion, provided Cox with additional records responsive to his request.  (*See* Second Declaration of Vanessa R. Brinkmann ("Second Brinkmann Decl.") (Doc. No. 52-36) ¶ 5.)  DOJ identified 448 additional pages of responsive records, and released 150 pages in full or in part.  (Second Brinkmann Decl. ¶¶ 9, 15.)  DOJ withheld records from this supplemental search pursuant to exemptions three, five, six, and seven.  (*Id.* ¶ 5.)  With respect to its exemption five withholdings, DOJ withholds records as attorney work product, attorney-client privileged, and as subject to the deliberative process privilege.  (*Id.* ¶¶ 15–39.)  The Second Brinkmann Declaration, like the first, organizes the records withheld into logical categories and describes the basis of each claimed exemption, (*id.*), includes *Vaughn* index providing more detail about each record subject to the exemption, (*id.*, Ex. B), and describes DOJ's efforts to release all segregable information, (*id.* ¶¶ 40–44).

## 2.   DOD

Cox requested two specific versions of the SSCI Report in his requests to DOD (Request Nos. 1–2); made requests that mirrored requests three through six of the DOJ FOIA Request

(Request Nos. 3–6); and also requested "[a]ny records, documents, or non-record material that discuss or describe or document when, under what circumstances, and/or how many times the Department of Defense Deputy General Counsel (Intelligence) has accessed the SSCI Report on Torture or any portion thereof 'so that she may address/advise on litigation and other legal related matters, as necessary' or for other reasons" (Request No. 7).  (DOD FOIA Request.)

DOD determined that records responsive to Cox's FOIA requests one through four did not constitute agency records, but began a search for documents responsive to Cox's requests five through seven in April 2017.  (Herrington Decl. ¶ 5.)  DOD did not locate documents responsive to Cox's requests five or seven, but did locate records responsive to Cox's sixth request, and produced some while withholding five email chains.  (*Id.* ¶¶ 5–7, 13.)  DOD Associate Deputy General Counsel in the Office of General Counsel explains in his declaration that DOD withheld the five email chains in full pursuant to exemption five, (Herrington Decl., ¶ 18), identified personal information in those documents pertaining to other agencies' employees that those agencies stated was subject to exemption six, (Herrington Decl., ¶ 18), and separately made four redactions of DOD email addresses in documents produced by DOJ pursuant to exemption six, (Herrington Decl. ¶ 16).

Describing the emails withheld in full further, Herrington explains they are subject to exemption five as attorney-client privileged because they contain "communications between DOJ counsel defending DoD in *ACLU v. CIA* with [Herrington], as agency counsel, and communications with [Herrington] and other attorneys with DoD OGC concerning the status of whether DoD had any copies of the final SSCI report and how those copies were being stored and treated."  (*Id.* ¶ 13.)  Herrington explains that the same documents are also subject to exemption five based on the work-product doctrine because the "communications were prepared

14

in relation to the then-ongoing *ACLU v. CIA* FOIA litigation, and disclosure would reveal the mental impressions and strategies of counsel." (*Id.* ¶ 14.)  Finally, Herrington explains that the same documents are subject to the exemption five deliberative process privilege because "they are predecisional discussions about how to respond to the Complaint or litigation strategy at different stages of the proceedings in *ACLU v. CIA*" and that disclosure would "harm the ability to have frank and candid discussions between agency counsel and DOJ attorneys in the future." (*Id.*)  These documents were withheld in full, Herrington adds, because after "conduct[ing] a document-by-document and line-by-line review," he "determined that no segregable, non-exempt portions of documents could be released without potentially compromising information protected by FOIA." (*Id.* ¶ 15.)

### 3. FBI

Cox's request to the FBI mirrored his DOJ FOIA Request, but it did not include Cox's seventh and eighth requests to DOJ.  (FBI FOIA Request.)

In January 9, 2017, letter, the FBI told Cox that it had located no documents responsive to his requests.  (*See* Hardy Decl. ¶ 6, Ex. B.)  Cox appealed, but the FBI's response was affirmed on May 2, 2017.  (*See id.* ¶¶ 7–9, Exs. C, E.)  After Cox filed this action, the FBI conducted an additional search and located 181 pages of responsive records.  (*Id.* ¶ 11.)  The FBI released nine pages in full, 143 pages in part, and withheld 29 pages in full.  (*Id.*)  The FBI withheld information pursuant to exemptions one, three, five, six, and seven.  (*Id.* ¶ 27.) In his declaration, David M. Hardy, FBI Section Chief of the Record/Information Dissemination Section of the Information Management Division, states that the FBI redacted a single page of records, Cox-123, pursuant to FOIA exemption one.  (Hardy Decl. ¶ 36 n.13.)  According to Hardy, the FBI redacted this information

> to protect from disclosure information that would reveal the actual intelligence
> activities and methods used by the FBI against specific targets of foreign
> counterintelligence investigations or operations; identify a target of a foreign
> counterintelligence investigation; or disclose the intelligence gathering capabilities
> of the activities or methods directed at specific targets.

(*Id.* ¶ 34.)  Hardy explains that the withheld information is subject to exemption one because it is

protected from disclosure under Executive Order 13526, § 1.4.  Classified National Security

Information, Exec. Order No. 13,526 § 1.4, 75 Fed. Reg. 707 (Dec. 29, 2009).  Hardy describes

the harm that could arise from disclosure of this information and declines to provide further

information about the document, stating that "the disclosure of the specific and detailed

information describing the intelligence activities or methods withheld in these pages . . . could

reasonably be expected to cause damage to national security."  (Hardy Decl. ¶¶ 34–36.)

Hardy also discusses the records withheld pursuant to exemption five under the

deliberative process privilege and attorney-client privilege.  (*Id.* ¶¶ 48–49.)  Regarding the FBI's

withholdings pursuant to the exemption five deliberative process privilege, Hardy states,

> The FBI relied on Exemption 5 and the deliberative process privilege to protect
> deliberations between FBI employees concerning information that was in draft
> form (working copies of the SSCI report), and handwritten notes and
> communications between FBI employees discussing these drafts and discussions,
> recommendations, and proposals for how FBI equities should be presented and/or
> protected within the final report.

(*Id.* ¶ 49.)  Then, after describing the harm he claims might will result from disclosing this

information, Hardy includes a footnote to the pages withheld pursuant to this exemption.  (*Id.* ¶

49 n.19.)  Regarding the FBI's withholdings pursuant to the exemption five attorney-client

privilege, Hardy states,

> The FBI has protected communications between and among FBI counsel and their
> FBI client employees reflecting the seeking and/or providing of legal advice with
> respect to aspects of the FBI information contained within the report.  Specifically,
> the FBI withheld information from emails between FBI's attorneys and other FBI
> personnel discussing matters pertaining to the application of an investigative

16

technique, and a report containing information discussing legal issues regarding detainees.

(*Id.* ¶ 51.)  After describing the harm that he expects would come from disclosing agency legal advice, Hardy identifies in a footnote the records withheld pursuant to this exemption.  (*Id.* ¶ 51 n.20.)  Finally, Hardy writes, "During the processing of Plaintiff's request, each responsive page was individually examined to identify non-exempt information which could be reasonably segregated and released.  All segregable information has been released to Plaintiff."  (*Id.* ¶ 70.)

The FBI withheld some information in these documents at the request of the CIA.  On October 4, 2017, the FBI sent the CIA 39 documents totaling 132 pages that it determined might be responsive to Cox's request, but that might contain CIA information.  (Shiner Decl. ¶ 9; Hardy Decl. ¶ 69.)  In response, the CIA requested that the FBI assert FOIA exemptions with respect to 29 records.  (*Id.*)  The CIA claimed FOIA exemptions with respect to documents responsive to Cox's DOJ FOIA Request as well, and provided a single declaration stating that it requested that DOJ records be withheld pursuant to exemptions three and six, but not stating the exemptions based upon which it requested FBI records be withheld.  (Shiner Decl. ¶ 9.)  Instead, the CIA cites particular FBI records as examples of records withheld pursuant exemptions one, (*id.* ¶¶ 19, 25, 32), three, (*id.* ¶¶ 35, 37), and five, (*id.* ¶¶ 38–39).[3]

In summarizing the FBI's withholdings at the end of his declaration, Hardy states that the 29 pages the FBI withheld in full were withheld by the FBI pursuant to exemptions five, six, and seven and by the CIA pursuant to exemption three.  (Hardy Decl. ¶ 71.)  Hardy notes that the FBI redacted information on 143 pages and does not state whether the CIA made any request for withholding with respect to these pages.  (*Id.*)

---

[3] Given that the CIA withheld identifying information of personnel pursuant to exemption six, it appears likely that it withheld information in FBI records, in addition to DOJ records pursuant to this exemption – though the declaration does not make this clear.  (Shiner Decl. ¶ 41.)

Although Hardy's declaration for the FBI does not mention the CIA withholding records pursuant to exemptions one or five, Shiner's declaration for the CIA describes withholding FBI records pursuant to these exemptions.  In her declaration, CIA Information Review Officer Antoinette B. Shiner explains that the CIA withheld pursuant to exemption one information related to one of six categories:

> (i) personnel associated with the former detention and interrogation program; (ii) the locations of covert Agency facilities, including former detention centers located abroad; (iii) information pertaining to specific intelligence activities, methods, and operations, including certain counterterrorism techniques; (iv) code words and pseudonyms; (v) classification and dissemination control markings; and (vi) relationships with foreign liaison partners.

(Shiner Decl. ¶ 15.)  According to the CIA, it recommended that these documents be withheld pursuant to FOIA exemption one because they "satisf[y] the procedural and substantive requirements of Executive Order 13526, which governs classification."  (Shiner Decl. ¶ 13.)

Shiner goes on to provide general justifications for withholding information related to each of the six identified categories of confidential information pursuant to exemption one and Executive Order 13526.  (Shiner Decl. ¶¶ 16–31.)  For some of the categories, she also identifies a particular record withheld pursuant to exemption one that contained that category of information.  For instance, Shiner cites a set of handwritten notes, Cox-110–122, as an example of a document that "contain[s] details related to the current locations of covert CIA installations and former detention centers located abroad, and goes on to explain that the CIA "withheld references to the location of a former Agency detention facility."  (*Id.* ¶¶ 19–20.)  According to Shiner, the disclosure of detention facilities could "endanger the physical safety of covert CIA officers who work at those locations" and is "likely to cause complications for the host country," negatively impacting CIA intelligence efforts.  (*Id.* ¶¶ 19–20.)

According to Shiner, the CIA also withheld information pursuant to exemption five based on attorney-client privilege and the deliberative process privilege.  (Shiner Decl. ¶¶ 38–39.) Regarding attorney-client privilege, Shiner states that two FBI documents responsive to Cox's request, Cox-123–138 and Cox-139–153, were attorney-client privileged because they were emails between DOJ and CIA attorneys "arising from a request made by CIA to DOJ for legal advice concerning the SSCI [] Report" to which "FBI attorneys were subsequently added."  (*Id.* ¶ 38.)  As the basis for asserting the deliberative process privilege, Shiner writes,

> Here, the CIA invoked the deliberative process privilege and Exemption 5 to protect certain inter-agency communications related to the process by which the CIA and other Executive Branch agencies agreed to declassify certain national security information for inclusion in the Executive Summary of the SSCI [] Report that was released to the public on 8 December 2014.  This includes the above-referenced legal consolations with DOJ attorneys (Cox-123 to Cox-138 and Cox-139 to Cox-153) as well as deliberations between national security professionals at CIA and FBI (e.g., Cox-161 to Cox-165).  Further, I have examined all of the documents withheld pursuant to the deliberative process privilege and have determined that, to the extent there is any factual material, it is part and parcel of the deliberations and cannot be further segregated.

(*Id.* ¶¶ 39–40.)  Although the CIA does not specifically identify all of the documents over which it asserts the deliberative process privilege, Shiner does state earlier in her affidavit that 27 of the 29 FBI records the CIA requested be withheld are emails that "reflect CIA communications with FBI and DOJ regarding the deliberations over the eventual public release of certain information in the Executive Summary of the SSCI Report," and that contain "requests . . . for legal advice concerning the potential release of certain information, as well as deliberations between national security professionals at CIA and FBI related to the national security implications of the release of certain information."   (*Id.* ¶ 11.)  Shiner states that the two other documents withheld relate to the same deliberations, one of which is a letter from the FBI to the CIA, and the other the set of handwritten notes, Cox-110–122, which arose "from the review of a draft version of the

19

Executive Summary." (*Id.*) Shiner adds that she had "examined all of the documents withheld pursuant to the deliberative process privilege and have determined that, to the extent there is any factual material, it is part and parcel of the deliberations and cannot be further segregated." (*Id.* ¶ 40.)

### 4.   ODNI

Cox made five requests to ODNI, which closely mirrored the language of requests one through six of the DOJ FOIA Request.  Cox sought "the copy of the final version of the SSCI Report sent to the ODNI in December 2014" (Request No. 1); any other copies of the final SSCI Report including "portions… that have been cut and pasted into, or quoted in, other ODNI documents" (Request No. 2); draft copies of the SSCI report (Request No. 3); "records, documents, or non-record material discussing or referencing any copes of the final or draft SSCI Report that were previously in ODNI possession that were removed, transferred, destroyed, or otherwise disposed of" (Request No. 4); and communications or documentation of communications between ODNI and various agencies, government officials, and members of Congress regarding "how ODNI or other entities should handle or treat copies of either the draft or final SSCI Report" (Request No. 5).  (ODNI FOIA Request.)

ODNI acknowledged receipt of Cox's FOIA request but had not processed the requests before Cox filed this action on June 2, 2017.  (Walsh Decl. ¶¶ 13–14, Ex. B.)  ODNI later released 65 pages of records responsive to Cox's FOIA request, redacting portions of the documents pursuant to exemptions three, five, and six.  (*Id.* ¶¶ 15, 18.)  Regarding its exemption five redactions, Diedre Walsh, ODNI's Chief Operating Officer and Chief Freedom of Information Act Officer, explained that the agency withheld portions of two sets of email exchanges pursuant to the exemption five deliberative process privilege.  (*Id.* ¶¶ 39–40.)  Walsh

explains these emails contain predecisional, back-and-forth deliberations related to (1) proposed

responses to media inquiries and (2) the response to Senator Burr's request that copies of the

SSCI Report be returned to the SSCI.  (*Id.* ¶ 40.)  Walsh goes on to describe the email exchanges

further, explain the harm that could arise from their disclosure, and state that "[a]ll reasonably

segregable, non-exempt information was released to Plaintiff."  (*Id.* ¶¶ 40, 42.)

### 5.   State Department

Cox's requests to the State Department mirrored his requests to ODNI, except he

included an additional request for "records, documents, or non-record material that discuss or

describe when, why, and/or under what circumstances the Department of State 'marked the outer

envelope "Congressional Record – Do Not Open, Do Not Access,"'" (Request No. 5).  (State

Department FOIA Request.)  The State Department did not search for records responsive to

Cox's first through third requests, as it determined that draft and final copies of the SSCI Report

were not agency records.  (Stein Dec. ¶¶ 10–13.)  The State Department conducted searches for

Cox's remaining requests, and located a number of documents, some of which it released to Cox

on a rolling basis beginning in 2018.  (*Id.* ¶¶ 7–9, 14–77; *see also* Compl. ¶ 111.)

In his declaration, Director of the State Department's Office of Information Programs and

Services Eric F. Stein explains that, as of April 19, 2019, the State Department had located 374

records responsive to Cox's request, releasing 29 in full, 53 in part, and withholding 292 in full.

(Stein Decl. ¶¶ 7–9, 77, Exs. D, E, F.)  The State Department withheld records pursuant to FOIA

exemptions three, five, and six.  (*Id.* ¶¶ 64–76.)  A *Vaughn* index included with Stein's

declaration describes each record withheld pursuant to an exemption and the basis for that

withholding.  (*Id.*, Ex. A.)  Describing the withholdings pursuant to exemption five, Stein

explains that the State Department withheld records based on the deliberative process privilege,

21

including inter- and intra-agency discussions related to communicating with Congress in response to Senator Burr's request that copies of the SSCI Report be returned; based on the attorney-client privilege, for records containing communications with attorneys at the State Department and DOJ; and based on the attorney work-product doctrine, including documents related to the American Civil Liberties Union's FOIA litigation related to the SSCI Report.  (*Id.* ¶¶ 70–72.)  As Stein notes in his affidavit, the basis for withholding each document pursuant to exemption five is detailed in the accompanying *Vaughn* index.  (*Id.*; *id.*, Ex. A.)  Stein further states that the State Department "conducted a line-by-line review of all the documents released in part or withheld in full, . . . segregated and released all reasonably segregable, non-exempt information," and "otherwise determined that no segregation of meaningful information in the documents could be made without disclosing information warranting protection under law."  (*Id.* ¶ 77.)

## III.   Complaint

Cox filed this action on June 2, 2017.  (Doc. No. 1.)  Cox has since twice amended his complaint and the Second Amended Complaint is now the operative pleading.  (Second Amended Compl. ("Compl.") (Doc. No. 26).)  Cox brings claims under FOIA, claiming that the Agencies are improperly withholding records responsive to his FOIA requests, and requesting that the Court order the Agencies to produce the responsive records and award him costs pursuant to 5 U.S.C. § 552(a)(4)(E).  (*Id.* ¶¶ 58, 71, 85, 101, 111, 112.)  Appended to Cox's complaint are the December 2012 Letter, the April 2014 Letter, the December 2014 Letter, and Cox's FOIA requests to the Agencies.  (Compl., Exs. A–H (Doc. Nos. 26-1–8.).)

IV.     **Motion to Dismiss and Motion for Summary Judgment**

On November 22, 2019, the Agencies moved to dismiss the complaint with respect to

Cox's FOIA requests for draft and final copies of the SSCI Report, and for summary judgment

with respect to Cox's remaining FOIA requests.  (Notice of Motion to Dismiss and for Summary

Judgment (Doc. No. 52).)  These motions, along with Cox's arguments in opposition, are

outlined below.

A.      **Motion to Dismiss**

The Agencies move to dismiss Cox's claims that the Agencies are improperly

withholding copies of the SSCI Report, portions of the SSCI Report quoted in other documents,

and drafts of the SSCI Report responsive to Cox's FOIA requests.  (Mot. at 21–22.)  This motion

to dismiss "applies to items 1-4 of the requests to DOJ[,] . . . FBI," and DOD, "and to items 1-3

of the requests to ODNI and State."  (Mot. at 22; DOD FOIA Request; DOJ FOIA Request; FBI

FOIA Request; ODNI FOIA Request; State Department FOIA Request.)  The Agencies move to

dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3).

The Agencies contend that the draft and final copies of the SSCI Report Cox seeks are

not "agency records," but rather "congressional records" not subject to FOIA.[4]  (Mot. at 21–22.)

The Agencies first argue that the Court should adopt the D.C. Circuit's test for when records

constitute "agency records" subject to FOIA.  (*Id.* at 24.)  If the Court were to apply this test, the

Agencies contend, it would conclude that the SSCI intended to retain exclusive control over the

draft and final reports, and that they are therefore not subject to FOIA.  (*Id.* at 25–26.)  In support

of this view, the Agencies rely on the D.C. Circuit's decision in *American Civil Liberties Union*

---

[4] The Agencies characterize the December 2014 SSCI Report as the "final" Report and the prior versions from April 2014 and December 2012 as "drafts."  (Mot. at 11.)  For ease of reference, the Court will at times refer to the December 2012 and April 2014 reports as "drafts," but this should not be construed as a finding about the status of those reports.

*v. C.I.A.*, 823 F.3d 655 (D.C. Cir. 2016), *reh'g en banc denied* (July 13, 2016), *cert. denied*, 137 S.Ct. 1837 (2017), the June 2009 Letter's directions to the CIA regarding SSCI-created records and reports, as well as the SSCI's treatment of the reports and communications with the executive branch.  (Mot. at 25–31.)  The Agencies also argue that the Agencies' own treatment of the reports and other policy considerations counsel in favor of finding that the reports are not "agency records" subject to FOIA.  (*Id.* at 32–34.)

In his opposition brief, Cox argues that the December 2012 SSCI Report, the April 2014 SSCI Report, the December 2014 SSCI Report, and agency memoranda quoting these reports constitute "agency records" based on the "plain meaning of that term."  (Opp. at 14.)  Cox contends that the Agencies have uploaded versions of the SSCI Report to their systems, and annotated hard-copy versions of the SSCI Report, thus creating unique agency records.  (*Id.* at 15.)

Cox urges the Court not to adopt the D.C. Circuit's test to determine what constitutes an "agency record," but rather to look to the Supreme Court's decision in *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989).  According to Cox, under the standard articulated in *Tax Analysts*, the SSCI Report, and memoranda quoting the reports, are agency records.  (Opp. at 16–20.)  But even if the Court adopts the D.C. Circuit's test, Cox argues, Congress did not express an intent to control the SSCI Report when it transferred copies to the Agencies, making the report copies and documents quoting the reports "agency records" under the D.C. Circuit's test.  (Opp. at 21–23.)  Cox cites to the December 2014 Letter from Senator Feinstein to argue that the SSCI did not intend to retain control over copies of the SSCI Report.  (*Id.* at 21.)  Cox also disputes that the June 2009 Letter was an expression of the SSCI's intent with respect to the SSCI Report generally; instead, he argues, the letter only applied to the SSCI's dealings with the

CIA, did not represent a final agreement between the SSCI and the CIA, and was only intended to address treatment of documents kept in the CIA reading room where SSCI staffers worked, not the copies of the SSCI Report later transmitted to the CIA. (*Id.* at 23–26.)

In their reply brief, the Agencies argue that the Supreme Court's decision in *Tax Analysts* did not provide a conclusive "agency record" test, and that the D.C. Circuit's jurisprudence since *Tax Analysts* enables "Congress to retain control of its documents when Congress sees fit to do so." (Reply Memorandum in Support of Defendants' Motion to Dismiss and for Summary Judgment ("Reply") (Doc No. 52-35) at 15–16.) The Agencies go on to argue that the SSCI evinced its intent to retain control of the SSCI Report, disputing Cox's characterizations of the June 2009 Letter and the December 2014 Letter from Senator Feinstein. (Reply at 16–18.) The Agencies argue that Congress's intent to retain control of the SSCI Report is further supported by the classification of copies of the reports. (*Id.* at 17.) Finally, responding to Cox's argument that the Agencies have uploaded separate copies of the SSCI Report, and that those are therefore agency records, the Agencies argue that they are not obligated to process duplicate records in response to a FOIA request, and that even if some hard copies of the SSCI Report include agency annotations, those documents remain congressional records not subject to FOIA. (*Id.* at 20–21.) In his sur-reply brief, Cox argues once again against this Court adopting the D.C. Circuit's "agency record" test. (Plaintiff's Sur-Reply ("Sur-Reply") (Doc. No. 52-37) at 2–4.) Cox goes on to argue that if the Court adopts the D.C. Circuit's test, the Agencies have not met their burden of establishing that Congress intended to retain control over copies of the SSCI Report transmitted to the Agencies. (*Id.* at 5–6.) He contends that the Agencies have not presented any evidence of the SSCI's intent to retain control over copies of the SSCI Report that is contemporaneous with the SSCI's transmittal of those copies to the Agencies. (*Id.* at 5.) Finally,

25

Cox once again argues that the June 2009 Letter is not evidence of the SSCI's intent with respect to the copies of the SSCI Report transmitted to the Agencies. (*Id.* at 6–8.**)**

### B.     Motion for Summary Judgment

The Agencies' motion for summary judgment relates to Cox's FOIA requests for documents other than the final versions, draft versions, or portions of the SSCI Report. (Mot. at 34–54.) Specifically, the Agencies seek summary judgment that they are not improperly withholding records with respect to Cox's request numbers five through eight to DOJ, five and six to FBI, five through seven to DOD, four and five to ODNI, and four through six to the State Department. (Mot. at 35–37; DOD FOIA Request; DOJ FOIA Request; FBI FOIA Request; ODNI FOIA Request; State Department FOIA Request.) Cox describes these as the requests "seeking communications related to Defendants' treatment" of the SSCI Report. (Opp. at 27.) The Agencies seek to establish that (1) they conducted adequate searches for the requested records, (Mot. at 34–38), and (2) they properly withheld responsive records or portions of responsive records pursuant to the FOIA exemptions one, three, five, six, and seven, and released all reasonably segregable non-exempt portions of records, (Mot. at 38–55). *See* 5 U.S.C. § 552(b).

The scope of the motion has narrowed since it was filed. The Agencies produced documents in response to the FOIA requests after Cox filed this action, and continued to do so during briefing on the instant motions. (*See* Stein Decl. ¶¶ 7–9 (explaining that State Department informed Cox it had located and released responsive documents by letters dated March 23, 2018, April 27, 2018, and April 19, 2019); Second Brinkmann Decl. ¶¶ 1–11 (describing DOJ's supplemental search); Sur-Reply at 8 (noting that DOJ "supplemented its earlier search in response to Plaintiff's Opposition").) In light of these subsequent productions, Cox withdraws

his challenges to the adequacy of the searches conducted by the Agencies.  (*See* Opp. at 28
(withdrawing challenges to adequacy of searches performed by the Department of State, the FBI,
and the ODNI); Sur-Reply at 8–9 (withdrawing his challenges to the adequacy of searches
performed by DOJ and DOD).)  Furthermore, in his opposition and sur-reply, Cox withdraws
any challenges to the Agencies' withholdings pursuant to exemptions three, six, and seven.  (*See*
Opp. at 31 (withdrawing general challenge to redactions made pursuant to exemption three);
Opp. at 39 (withdrawing challenge to redactions regarding law enforcement techniques made
pursuant to exemption seven); Sur-Reply at 11 (withdrawing challenge to information withheld
pursuant to exemption six).)

Cox thus only argues that the Agencies' withholding of records pursuant to FOIA
exemptions one and five was improper.  *See* 5 U.S.C. §§ 552(b)(1), 552(b)(5).  Regarding the
exemption one withholdings – only made by the FBI – Cox argues that the FBI and CIA
declarations in support of these withholdings "fail to provide sufficient detail to justify
withholdings under (b)(1)."  (Opp. at 29.)  Cox specifically calls into question the FBI's
withholding of "handwritten notes from the review of a draft version of the Executive Summary"
(Bates numbers Cox-110–122) pursuant to exemption one based on the CIA's claim that they
"contain details related to the current locations of covert CIA installations and former detention
centers located abroad."  (Shiner Decl. ¶ 11, 19.)  Cox casts doubt on this explanation, arguing
that "even in the *classified* version of the *Torture Study* the 'names of the countries that hosted
CIA detention sites' are identified only by pseudonyms."  (Opp. at 30.)

Cox makes a "limited request" that the Court review *in camera* the FBI record bearing
the Bates number Cox-30 "[a]s a check" on the claims made by the FBI and CIA in the Shiner
and Hardy Declarations.  (Opp. at 31.)  The brief email in question was produced with

substantial redaction pursuant to, among other exemptions, exemption one.  (*Id.*)  Cox argues

that it is "implausible," given the email's brevity, that it contains one of the categories of

classified information identified by the CIA in the Shiner Declaration or that it does not

otherwise contain segregable information.  (*Id.*)

In response, the Agencies contend that the Court should not grant Cox's request for *in*

*camera* review because the Shiner and Hardy Declarations are sufficiently detailed and entitled

to deference that outweighs Cox's "paper thin speculation."  (Reply at 27–28.)  With respect to

the specific records Cox discusses in his opposition – Bates numbers Cox-30 and Cox-110–122 –

the Agencies argue that Cox's speculative arguments fail to acknowledge that information was

withheld in these records based on the fact that they contained multiple types of classified

information (in the case of Cox-110–122) and fell under multiple FOIA exemptions (in the case

of Cox-30).  (Reply at 28–29.)  In further support of withholding the record, the Agencies note

that Cox-30 "contains the name of a covert officer."  (*Id.* at 29.)

With respect to the exemption five withholdings, Cox contends that the Agencies'

*Vaughn* affidavits and indexes fail "to provide sufficient detail to justify withholdings under

(b)(5)."  (Opp. at 32.)  Cox objects once again to the FBI's decision to withhold the handwritten

notes, Cox-110–122, arguing that the broad assertion of the exemption five deliberative process

privilege to these notes is unsupported because the notes "likely contain 'factual matter'" which

could be segregated from the deliberative material.  (*Id.*)

Next, Cox challenges the agencies' exemption five claims based on attorney-client

privilege, arguing that there is reason to believe attorneys' advice "led to . . . unlawful disposal

of records."  (Opp. at 32.)  Cox cites to documents that he claims suggest that in December 2014,

DOJ provided guidance to the CIA that "resulted in CIA attorneys directing CIA personnel to

intentionally delete an electronic copy of the *Torture Study*" while separate FOIA litigation regarding a request for that document was pending.  (*Id.* at 33.)  Cox also argues that agencies improperly surrendered copies of the SSCI Report in response to a request for copies of the Report from Senator Richard Burr, and suggests that DOJ guidance played a role in this decision as well.  (*Id.* at 35.)  According to Cox, the disposal of these copies of the SSCI Report violated FOIA preservation obligations as well as other federal records laws.  (*Id.* at 36–37.)  Just as the crime-fraud exception may prevent a party from asserting that communications with an attorney are subject to attorney-client privilege, Cox argues that the attorneys involved in the guidance described above "may have been involved in . . . the unlawful disposal of records," and that a crime-fraud exception to exemption five may apply.  (*Id.* at 32.)  For this reason, Cox requests that the Court conduct an *in camera* review of "a sample" of records withheld by the Agencies pursuant to exemption five, and specifically identifies particular documents withheld by the DOD and the State Department.  (*Id.* at 39.)

In response, the Agencies first argue that the handwritten notes bearing Bates numbers Cox-110–122 were properly excluded under exemption five because they were part of "ongoing internal deliberations regarding the accuracy and protection of FBI equities in the [SSCI] Report."  (Reply at 30.)  Next, the Agencies address Cox's arguments related to the alleged DOJ guidance to dispose of documents.  The Agencies first note that it is "an open question" whether the crime-fraud exception applies to assertions of exemption five attorney-client privilege, and argue that it should not.  (Reply at 30–31.)  The Agencies then go on argue that DOJ's preservation guidance was "correct" and Cox has not shown the existence of a crime or fraud. (*Id.* at 32–35.)  In his sur-reply, Cox largely stands on his prior briefing, but disputes the Agencies' characterization of their legal obligations to preserve records.  (Sur-Reply at 9–11.)

**STANDARD OF REVIEW**

The standards of review applicable to the Agencies' motion to dismiss and motion for summary judgment are discussed separately below.  However, the Court briefly notes one aspect of its review applicable to both motions: although Cox is proceeding *pro se*, he is also a lawyer, and therefore not entitled to the liberal construction of his pleadings normally afforded to *pro se* litigants.  (*See, e.g.*, Opp. at 30 (noting that Cox "represent[ed] Guantanamo detainees in *habeas* proceedings").)  *See Jaffe v. Capital One Bank*, No. 09-CV-4106 (PGG), 2010 WL 691639, at *2 (S.D.N.Y. Mar. 1, 2010) ("A lawyer proceeding *pro se* is not entitled to the special consideration that courts customarily grant to pro se parties." (citing *Harbulak v. County of Suffolk*, 654 F.2d 194, 198 (2d Cir. 1981)).

**DISCUSSION**

**I.    Motion to Dismiss**

The Agencies move pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3) to dismiss Cox's claims that the Agencies are improperly withholding copies of the SSCI Report, portions of the SSCI Report quoted in other documents, and drafts of the SSCI Report, arguing that this Court lacks subject-matter jurisdiction because the request documents are not "agency records."  (Mot. 21–22.)  For the reasons below, this motion is denied.

**A.    Construing the Agencies' Motion as a Rule 12(b)(6) Motion**

First, a motion to dismiss on the basis that the requested documents are not agency records is properly brought on the merits – under Federal Rule of Civil Procedure 12(b)(6) or as a motion for summary judgment under Rule 56 – not Rules 12(b)(1) or 12(h)(3).  The Second Circuit has construed the mention of "jurisdiction" in § 552(a)(4)(B) "to reference remedial power, not subject-matter jurisdiction."  *Main Street Legal Servs, Inc. v. NSC*, 811 F.3d 542,

30

566–67 (2d Cir. 2016).  An agency's motion to dismiss based on the fact that the requested documents are not "agency records" thus does not implicate the Court's *power* to order that relief, but the merits of the action, and is therefore properly brought as a motion to dismiss for failure to state a claim under Rule 12(b)(6).  As a district court in the D.C. Circuit recently explained:

> Thus, notwithstanding section 552(a)(4)(B)'s reference to "jurisdiction[,]" Courts have long considered FOIA disputes that pertain to the nature of the defendant entity (i.e., is it an "agency"?) or the nature of the records at issue (i.e., are they "agency records"?) to relate to the merits of a plaintiff's claim that the defendant has violated the FOIA, rather than a court's authority to adjudicate the case. This means that a Rule 12(b)(1) motion to dismiss brought solely on the grounds that the court lacks subject-matter jurisdiction because the records are not "agency records" necessarily fails.

*Cause of Action Inst. v. Internal Revenue Serv.*, 390 F. Supp. 3d 84, 96 (D.D.C. 2019); *see also Citizens for Responsibility & Ethics in Washington v. Office of Admin.*, 566 F.3d 219, 225 (D.C. Cir. 2009) (explaining that the district court erred in dismissing the complaint under Rule 12(b)(1) based on the fact that the Office of Administration was not an agency subject to FOIA but affirming the district court's dismissal pursuant to Rule 12(b)(6)).

The Agencies thus improperly seek dismissal for lack of subject-matter jurisdiction, instead of bringing their motion on the merits.  However, where a motion is brought under Federal Rule of Civil Procedure 12(b)(1) in error, a court "may 'construe [the] motion as one to dismiss under 12(b)(6) (failure to state a claim upon which relief can be granted) or, in that both parties have proffered and relied upon matters outside the pleadings, a motion for summary judgment under Rule 56.'"  *Basile v. Levittown United Teachers*, 17 F. Supp. 3d 195, 206 (E.D.N.Y. 2014) (quoting *Newsom-Lang v. Warren Int'l*, 129 F. Supp. 2d 662, 666 (S.D.N.Y. 2001)).

Because the Agencies moved to dismiss pursuant to Rule 12(b)(1) and 12(h)(3), both the

Agencies and Cox "relied upon matters outside the pleadings" in briefing this motion to dismiss.

*Basile*, 17 F. Supp. 3d at 206.  Still, the Court finds that the parties' briefing is not appropriate

for conversion to summary judgment.  In opposing the motion to dismiss for lack of jurisdiction,

Cox argued that he should be entitled to discovery before the Court dismisses the action based on

Congress's intent to control the SSCI Report.  (Opp. at 26.)  Furthermore, Cox expressed an

interest in potentially cross-moving for summary judgment, and conversion of the motion would

deprive him of the opportunity to do so.  (Plaintiff's Response to Motion for Pre-Motion

Conference (Doc. No. 32) at 2.)  Ultimately, the Court cannot say, as is necessary to convert a

Rule 12 motion to a motion for summary judgment, that the "parties should reasonably have

recognized the possibility of conversion," so the Court declines to convert the Agencies' motion

to dismiss into a motion for summary judgment.  *Fernandez v. Windmill Distrib. Co.*, 159 F.

Supp. 3d 351, 357 (S.D.N.Y. 2016).  Instead, the Court construes the Agencies' motion to

dismiss as brought pursuant to Rule 12(b)(6).  *See Basile*, 17 F. Supp. 3d at 206.

### B.    Standard of Review and Judicial Notice

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead

"enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009)).  Although all allegations contained in the complaint are assumed to be

true, this tenet is "inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.

In adjudicating a motion to dismiss pursuant to Rule 12(b)(6), the Court may "consider those documents submitted by the parties which are matters of public record or which are deemed included in the Complaint." *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 140 n.5 (E.D.N.Y. 2010) (citing *Pani, M.D. v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998)). Cox appended to his second amended complaint the December 2012 Letter, the April 2014 Letter, the December 2014 Letter, and his FOIA requests to the Agencies. (Compl., Exs. A–H.) The Court may therefore consider these documents in adjudicating this motion to dismiss. *See LaFlamme*, 702 F. Supp. 2d at 140 n.5.

The Court cannot take judicial notice of the June 2009 Letter for the purpose of this motion to dismiss. This letter was not appended to or incorporated by reference in Cox's complaint. (*See generally* Compl.) Even if the Court could take judicial notice of this based on its (arguable) status as a public record, the Court could consider the document only for the fact of its existence, "not for the truth of the facts asserted" within the letter. *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006). It would therefore be improper for the Court to evaluate the June 2009 Letter for the purpose of determining the SSCI's intent regarding copies of the SSCI Report as it would not be using "the extraneous documents . . . to establish their existence, but rather to provide the reasoned basis for the court's conclusion." *Id.*

C.      **"Agency Record" Test**

FOIA does not define "agency record." *See Forsham v. Harris*, 445 U.S. 169, 187 (1980) (Brennan, J., dissenting) ("The Court concedes, of course, that the statute itself does not define 'agency records.'"). However, FOIA explicitly excludes Congress from its definition of "agency." *See* 5 U.S.C. § 551(1). Accordingly, congressional documents are not agency records. *See United We Stand Am., Inc. v. I.R.S.*, 359 F.3d 595, 597 (D.C. Cir. 2004) ("Because

33

Congress is not an agency, congressional documents are not subject to FOIA's disclosure requirement."). Yet, in its role overseeing executive branch agencies, Congress shares records with agencies. *See Goland v. Central Intelligence Agency*, 607 F.2d 339, 346 (D.C. Cir. 1978) (explaining that "Congress has undoubted authority to keep its records secret" but also "exercises oversight authority over the various federal agencies, and thus has an undoubted interest in exchanging documents with those agencies to facilitate their proper functioning in accordance with Congress' originating intent"). As a result, the determination of whether the requested documents are agency or congressional records can be a complex, and ultimately decisive, inquiry in FOIA actions.

In *U.S. Dep't of Justice v. Tax Analysts*, the Supreme Court articulated a two-part test for whether a document constituted an "agency record" for the purposes of a FOIA request: (1) the agency must "create or obtain" the document and (2) the agency must have been "in control of the requested materials at the time the FOIA request is made." 492 U.S. at 144–45. The Court affirmed the judgment of the D.C. Circuit below, but in that decision, the D.C. Circuit had applied for the first time a four-factor test for determining whether an agency was "in control" of a document:

> [1] the intent of the document's creator to retain or relinquish control over the records; [2] the ability of the agency to use and dispose of the record as it sees fit; [3] the extent to which agency personnel have read or relied upon the document; and [4] the degree to which the document was integrated into the agency's record system or files.

*Tax Analysts v. U.S. Dep't of Justice*, 845 F.2d 1060, 1069 (D.C. Cir. 1988); *see also Judicial Watch*, 726 F.3d 208, 218 (D.C. Cir. 2013) (stating that the D.C. Circuit "first announced this test in our own decision" in *Tax Analysts*). The Supreme Court did not discuss the D.C. Circuit's four-part control test in its *Tax Analysts* decision. However, in rejecting the Department of

Justice's argument that it was not "in control" of district court opinions because it lacked the power to alter the decisions' content, the Court explained, "By control we mean that the materials have come into the agency's possession in the legitimate conduct of its official duties." *Tax Analysts*, 492 U.S. at 145; *see also id.* at 147 ("The control inquiry focuses on an agency's possession of the requested materials, not on its power to alter the content of the materials it receives.").

Since *Tax Analysts*, the D.C. Circuit has continued to apply the four-part test for "control" of documents when determining if a requested document is an "agency record." *See Judicial Watch*, 726 F.3d at 218 (explaining that the Circuit applies the four-part test "in the usual case"). The D.C. Circuit has further held that the first two factors are dispositive with respect to documents "an agency has either obtained from, or prepared in response to a request from . . . the United States Congress." *Judicial Watch*, 726 F.3d at 221. This is because due deference to Congress requires focusing on Congress's intent to control the documents, "render[ing] the first two factors of the standard test effectively dispositive." *Id.*

Cox contends that the D.C. Circuit's approach to determining whether an agency is "in control" of a document is inconsistent with the "straightforward" test the Supreme Court applied in *Tax Analysts*. (Opp. at 19.) In support of his view that the Court announced a "straightforward" test for agency "control," Cox calls attention footnote six from the Supreme Court's opinion: "Because requested materials ordinarily will be in the agency's possession at the time the FOIA request is made, disputes over control should be infrequent." *Tax Analysts*, 492 U.S. at 146 n.6. (Opp. at 17.) According to Cox, this footnote is evidence that Supreme Court believed "control" should be a straightforward inquiry subject to no further limitation or analysis.

35

Cox's insistence that *Tax Analysts* announced an exhaustive "control" test precluding further doctrinal development is belied by a closer reading of that case.  In his argument, Cox omits the remainder of the above footnote, which goes on to read: "In some circumstances, however, requested materials might be on loan to another agency, 'purposefully routed ... out of agency possession in order to circumvent [an impending] FOIA request,' or 'wrongfully removed by an individual after a request is filed.' We leave consideration of these issues to another day." *Tax Analysts*, 492 U.S. at 146 n.6 (citation omitted) (quoting *Kissinger v. Reporters Committee for Freedom of Press*, 445 U.S. 136, 155, n. 9 (1980)).  The Supreme Court plainly recognized that "control" of agency records would not always be the straightforward inquiry that disposed of the case in *Tax Analysts* – in fact, it explicitly left the "control" inquiry open to further doctrinal development, particularly in circumstances where records are shared between government entities.  *Id.*

Cox nevertheless insists that *Tax Analysts* is dispositive of the case before the Court.  He likens the Agencies' position in the instant action to an argument advanced by the DOJ and rejected by the Supreme Court in *Tax Analysts*: that because the DOJ did not control the content of district court opinions, they were not agency records.  (Opp. at 18 ("Each Defendant here, like the defendant in *Tax Analysts*, argues that it nevertheless 'does not control' the material at issue and that it is controlled by an entity not subject to FOIA.  The Supreme Court rejected that argument, as this Court should here, as 'beside the point' on the basis that the 'control inquiry focuses on an agency's *possession* of the requested materials' not on whether it controls 'the content of the materials it receives.'" (citations omitted))).  This analogy is specious.  In *Tax Analysts*, the Supreme Court understood the DOJ to be advancing an "authorship-control" requirement – that an agency's control of a document would turn on the agency's "power to alter

36

the content of the materials it receives." *Tax Analysts*, 492 U.S. at 147.  The Court reasonably

rejected that argument, explaining that it would limit FOIA "essentially to documents generated

by the agencies themselves." *Id.*  Here, the Agencies argue that they do not control the

documents because Congress retained control of them when transferring them to the Agencies.

This argument has little relation to "authorship-control" test the Supreme Court rejected in *Tax*

*Analysts*.

The Court need not resolve the dispute between Cox and the Agencies as to whether the

Supreme Court's holding in *Tax Analysts* was inconsistent with the D.C. Circuit's four-part test

for agency "control" of a record.  Before the Court is the narrow question of the proper test for

agency "control" of documents obtained from Congress.  This is a question with its own unique

constitutional considerations – and a question not before the Court in *Tax Analysts*.  *Cf. United*

*We Stand Am., Inc.*, 359 F.3d at 599 (explaining that "the connection between Congress and the

requested records implicates considerations not at issue in *Tax Analysts*, where a non-profit

organization sought disclosure of judicial opinions possessed by the Department of Justice").

In *Goland v. Central Intelligence Agency*, the D.C. Circuit explained the unique problems

that arise when congressional documents are treated as "agency records" merely by their transfer

to an agency subject to FOIA:

> Congress has undoubted authority to keep its records secret, authority rooted in the
> Constitution, longstanding practice, and current congressional rules. Yet Congress
> exercises oversight authority over the various federal agencies, and thus has an
> undoubted interest in exchanging documents with those agencies to facilitate their
> proper functioning in accordance with Congress' originating intent. If plaintiffs'
> argument were accepted, Congress would be forced either to surrender its
> constitutional prerogative of maintaining secrecy, or to suffer an impairment of its
> oversight role.

*Goland*, 607 F.2d at 346.  Cox refers to *Goland* as the D.C. Circuit's "original sin," arguing it

created an unduly restrictive definition of "agency record" for the purpose of protecting

congressional documents that were already subject to protection from disclosure under the FOIA exemptions.  (Sur-Reply at 4.)  Yet this view of the FOIA's exemptions as a self-contained mechanism for sorting documents to be disclosed from those properly withheld is inconsistent with long-established Supreme Court jurisprudence.  For instance, the Supreme Court previously held that, despite the absence of an on-point FOIA exemption, agencies did not improperly withhold documents enjoined from disclosure by a district court.  *See GTE Sylvania, Inc. v. Consumers Union of U. S., Inc.*, 445 U.S. 375, 387 (1980).  The *GTE Sylvania* Court reasoned that in passing FOIA Congress "was largely concerned with the unjustified suppression of information by agency officials." *GTE Sylvania*, 445 U.S. at 385.  FOIA exemptions aside, there was no reason to read FOIA "to require an agency to commit contempt of court in order to release documents." *Id.* at 387.

The disclosure of congressional documents also raises concerns separate from FOIA's primary goal of preventing "unjustified suppression of information by agency officials." *GTE Sylvania*, 445 U.S. at 385.  Specifically, the disclosure of congressional documents raises unique constitutional concerns that Cox fails to adequately address.  Cox notes that "Defendants nowhere assert that the application of FOIA's exemptions to Defendants' copies of the *Torture Study* would be inadequate to protect any purported congressional restrictions," but does not address the question of why our constitutional system should leave it to the agencies to make this determination in the first place.  (Sur-Reply at 4.)  What if, as part of its oversight role, Congress wants to share documents with an agency while restricting public access to portions of those documents that would not fall within FOIA's exemptions?  Or what if Congress wants certainty as to the information that will be subject to public access *before* it releases them to agencies, as opposed to relying on agencies' and courts' subsequent assessments of whether particular

information falls within one of FOIA's enumerated exemptions?  Cox presents no answer to these concerns.  Far from hypothetical, these questions implicate the delicate separation of powers that underlies our constitutional system.  If Congress were forced to rely on predictions about agencies' and courts' assessments of applicable FOIA exemptions before sharing documents, its essential role as an oversight body would be severely inhibited.

Although they dispute the proper test to apply, the parties to this action agree that the Second Circuit has not adopted the D.C. Circuit's four-part test for agency control.[5]  (Mot. at 24; Opp. at 19.)  The Court concludes that FOIA is not best read as a statute that forces a choice between congressional oversight and the very congressional secrecy the statute protects by exempting Congress from its coverage.  Accordingly, the Court's inquiry into whether the documents at issue constitute agency records "turns on whether Congress manifested a clear intent to control the document[s]." *Judicial Watch*, 726 F.3d at 221 (quoting *United We Stand America, Inc.*, 359 F.3d at 596); *see also Am. Civil Liberties Union*, 823 F.3d at 663.  As the D.C. Circuit explained in *Judicial Watch*, this inquiry focuses on the first two prongs of the four-part "control" test the Circuit has articulated.  *See Judicial Watch*, 726 F.3d at 221 (explaining that the focus on Congressional intent "renders the first two factors of the standard test effectively dispositive").  These two factors are: "[1] the intent of the document's creator to retain or relinquish control over the records; [and] [2] the ability of the agency to use and dispose of the record as it sees fit." *Id.* at 218 (quoting *Tax Analysts*, 845 F.2d at 1069).  Finally, it is the Agencies' burden to establish that these records are not "agency records."  *See Tax Analysts*, 492 U.S. at 142 n.3 ("The burden is on the agency to demonstrate, not the requester to disprove, that

---

[5] Defendants do note that a district court within this Circuit appeared to apply an early variation of the four-part test in its decision in *Navasky v. Cent. Intelligence Agency*, 499 F. Supp. 269, 278 (S.D.N.Y. 1980).  However, as this decision, already not binding on this Court, predated the Supreme Court's decision in *Tax Analysts*, it is of little value in determining the legal question at issue here.

the materials sought are not 'agency records.'"); *see also Grand Cent. P'ship, Inc.*, 166 F.3d at 478.

### D.     Copies of the SSCI Report as Agency Records

The Agencies rely to a large extent on the SSCI's June 2009 Letter to the CIA to argue that the SSCI intended to retain control over copies of the SSCI Report.  However, as explained above, the Court cannot take judicial notice of this letter for the purposes of the instant motion to dismiss.  On the other hand, documents of which the Court can take judicial notice – including the December 2012 Letter, the April 2014 Letter, and the December 2014 Letter appended to Cox's complaint – provide mixed evidence of the SSCI's intent to relinquish control over the SSCI Report.  (December 2012 Letter; April 2014 Letter; December 2014 Letter; *see also* Compl., Exs. A–C (same).)

The Agencies accurately note the December 2012 Letter provides some support for the conclusion that the SSCI intended to retain control over the December 2012 SSCI Report.  In the December 2012 Letter, Senator Feinstein invited agency responses and noted, "After consideration of these views, I intend to present this report with any accepted changes again to the Committee to consider how to handle any public release of the report, in full or otherwise." (December 2012 Letter at 1.)  The Agencies cite the D.C. Circuit's analysis of this letter in *ACLU v. CIA*, arguing that the court found "the transmission of the 2012 draft made clear that the 'Committee intended to retain control over the Full Report.'"  (Mot. at 27 (quoting *Am. Civil Liberties Union*, 823 F.3d at 667)).  However, the D.C. Circuit's analysis of this letter appears to be largely premised on its prior examination of the June 2009 Letter, as is evident in the court's

statement that the December 2012 Letter "reinforced what had already been made clear in the June 2009 Letter."[6]  *Am. Civil Liberties Union*, 823 F.3d at 667.

If the December 2012 Letter contains indicia of the SSCI's intent to control the SSCI Report, it is difficult to ignore the absence of similar language in two subsequent letters from Senator Feinstein regarding the April 2014 SSCI Report and the December 2014 SSCI Report. In the April 2014 Letter, Senator Feinstein stated that she "encourage[d] and approve[d] the dissemination of the updated report to all relevant Executive Branch agencies."  (April 2014 Letter at 1–2.)  Then, in the December 2014 Letter, Senator Feinstein used language even more indicative of an intent to relinquish control:

> [T]he full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated.  To help achieve that result, I hope you will encourage use of the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees, as you see fit.

(December 2014 Letter at 1.)  Both of these letters provide compelling evidence that SSCI intended to "relinquish control" over the SSCI Report upon transmittal.  *Judicial Watch*, 726 F.3d at 218.  Looking at the second factor of the test, the letters – particularly the above-quoted lines from the December 2014 Letter – also provide substantial evidence that the SSCI granted the Agencies "the ability . . . to use and dispose of the record[s] as [they] s[aw] fit."  *Id.*

The Agencies separately argue that the fact that the SSCI sought declassification review of only the Executive Summary, and subsequently released only the Executive Summary publicly, supports the conclusion that it intended to retain control over the full versions of the SSCI Report.  (Mot. at 26.)  While this provides some evidence that the SSCI *did not* intend to

---

[6] The Agencies also point to an email from the SSCI Staff Director regarding the December 2012 SSCI Report. (Mot. at 28; Higgins Decl. ¶ 15 & Ex. E.)  However, as explained above, the Court cannot consider extrinsic evidence of this sort on a motion to dismiss pursuant to Rule 12(b)(6).

control the Executive Summary, the Court finds little support in this action alone for the conclusion that the SSCI intended to retain control over the non-Executive Summary portions of the SSCI Report.

The Agencies' remaining arguments in support of the conclusion that Congress intended to retain control over these records are not sufficient to justify dismissal here. The Agencies point to the fact that the SSCI's proceedings during the creation of the report were in closed session, and that SSCI information is by default confidential, but these facts provide little insight into what the SSCI intended with the reports once the SSCI transmitted them to the Agencies. (Mot. at 26.) The Agencies' note that copies of the SSCI Report were marked "top secret" is even less instructive. (*Id.*) As Cox rightly argues, these restrictions on dissemination imposed by classification authorities *in the Executive Branch* provide no insight into the relevant congressional intent here. (Opp. at 22.) Finally, the Agencies argue that the Agencies' own treatment of the SSCI Report supports the conclusion that Congress intended to retain control over the reports. (Mot. at 32.) As the Agencies acknowledge, however, this evidence – even if the Court could consider it on the instant motion – is largely irrelevant to determining *congressional* intent under the "agency record" test applied in this case. (*Id.*)

Based on the record before the Court, and drawing all inferences in Cox's favor, the Court cannot say that Congress "manifested a clear intent to control" the SSCI Report. *Judicial Watch*, 726 F.3d at 221. Accordingly, the Agencies' motion to dismiss is denied.

## II.    Motion for Summary Judgment

The Agencies move for summary judgment with respect to Cox's challenges to records withheld pursuant to FOIA exemptions one and five. *See* 5 U.S.C. § 551(b)(1), (b)(5). As noted

above, Cox has withdrawn any challenge to the Agencies withholdings under other exemptions or to the adequacy of the Agencies' searches.

### A.      Standard of Review and Applicable Law

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *see also Brosseau v. Haugen*, 543 U.S. 194, 195 n.1 (2004).

"In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that . . . any withheld documents fall within an exemption to the FOIA."  *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (citing 5 U.S.C. § 552(a)(4)(B)); *see also New York Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 509 (S.D.N.Y. 2007) ("For an agency to prevail on a summary judgment motion in a FOIA case, it 'must demonstrate that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements.'") (quoting *Ruotolo v. Dep't of Justice, Tax Div.*, 53 F.3d 4, 9 (2d Cir. 1995)).  In making this showing, agencies normally rely on affidavits that "describe the justifications for nondisclosure with reasonably specific detail, [and] demonstrate that the information withheld logically falls

within the claimed exemption." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009)

(quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). "Ultimately, an agency's

justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Id.*

      If the agencies have satisfied their burden, "the plaintiff must make a showing of bad

faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or

provide some tangible evidence that an exemption claimed by the agency should not apply or

summary judgment is otherwise inappropriate." *Carney*, 19 F.3d at 812 (citation omitted); *see

also Flores v. United States Dep't of Justice*, No. 15-CV-2627 (JMA), 2016 WL 7856423, at *9

(E.D.N.Y. Oct. 4, 2016), *report and recommendation adopted*, No. 15-CV-2627 (JMA) (RLM),

2017 WL 238425 (E.D.N.Y. Jan. 18, 2017), *aff'd*, 712 F. App'x 107 (2d Cir. 2018).  Agencies'

affidavits in support of their withholdings are entitled to a presumption of good faith.  *See

Carney*, 19 F.3d at 812; *Estate of Ghais Abduljaami v. U.S. Dep't of State*, No. 14-CV-7902

(RLE), 2016 WL 94140, at *2 (S.D.N.Y. Jan. 7, 2016) (same).  In addition to this presumption of

good faith, "[c]ourts are to give deference 'to executive affidavits predicting harm to the national

security, and have found it unwise to undertake searching judicial review.'"  *Am. Civil Liberties

Union v. Dep't of Def.*, 435 F. Supp. 3d 539, 554 (S.D.N.Y. 2020) (quoting *Am. Civil Liberties

Union v. Dep't of Justice*, 681 F.3d 61, 70 (2d Cir. 2012)).

      Courts may conduct *in camera* review of documents to evaluate an agency's claimed

exemptions.  However, "[a] district court should not undertake *in camera* review of withheld

documents as a substitute for requiring an agency's explanation of its claimed exemptions in

accordance with *Vaughn*."  *Seife v. United States Dep't of State*, 298 F. Supp. 3d 592, 630

(S.D.N.Y. 2018) (quoting *Spirko v. U.S. Postal Service*, 147 F.3d 992, 997 (D.C. Cir. 1998)).  In

adjudicating FOIA actions, "*[i]n camera* review is considered the exception, not the rule, and the

propriety of such review is a matter entrusted to the district court's discretion." *Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO v. N.L.R.B.*, 845 F.2d 1177, 1180 (2d Cir. 1988) (citing *Donovan v. F.B.I.*, 806 F.2d 55, 59 (2d Cir. 1986)); *see also Am. Civil Liberties Union v. Office of the Dir. of Nat. Intelligence*, No. 10-CV-4419 (RJS), 2011 WL 5563520, at *12 n.9 (S.D.N.Y. Nov. 15, 2011) (same).  The Second Circuit has described its approach to ordering *in camera* FOIA review as follows:

> With respect to *in camera* review, we adopted a restrained approach permitting such review where the record showed the reasons for withholding were vague or where the claims to withhold were too sweeping or suggestive of bad faith, or where it might be possible that the agency had exempted whole documents simply because there was some exempt material in them. By the same token, where the affidavit is sufficiently detailed to place the documents within the claimed exemptions, and where the government's assertions are not challenged by contrary evidence or a showing of agency bad faith, we have held that the district court should restrain its discretion to order *in camera* review.

*Halpern*, 181 F.3d at 292 (citations omitted).  In general, a "district court should first offer the agency the opportunity to demonstrate, through detailed affidavits and oral testimony, that the withheld information is clearly exempt and contains no segregable, nonexempt portions." *Seife*, 298 F. Supp. 3d at 630.

### B.     Exemption One Withholdings

FOIA exemption one exempts from disclosure matters that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 551(b)(1).  Executive Order 13,526 sections 1.4(c) and 1.4(d), the basis for the FBI and CIA's assertions that records are properly withheld under exemption one, establishes that information

> shall not be considered for classification unless its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national

45

security in accordance with section 1.2 of this order, and it pertains to [among other categories] . . . (c) intelligence activities (including covert action), intelligence sources or methods, or cryptology; [or] (d) foreign relations or foreign activities of the United States, including confidential sources.

Classified National Security Information, Exec. Order No. 13,526 § 1.4, 75 Fed. Reg. 707 (Dec. 29, 2009).

Cox contends that the FBI and CIA *Vaughn* affidavits submitted in support of the FBI's exemption one withholdings lack sufficient detail.  (Opp. at 29.)  The Court agrees.  The FBI and CIA's *Vaughn* affidavits are contradictory, vague, and ultimately insufficiently detailed for the Court to conduct meaningful review – or for Cox to meaningfully challenge – the FBI's exemption one withholdings.

In his *Vaughn* affidavit in support of the FBI's withholdings, Hardy states that the FBI withheld 29 pages in full.  (Hardy Decl. ¶ 71.)  Hardy explains that an unspecified number of the documents were withheld pursuant to exemption three by the CIA and that the remainder were withheld by the FBI pursuant to exemptions five, six, and seven.  (*Id.*)  This is at odds with the CIA's affidavit submitted with this case.  Shiner's declaration includes extensive discussion of the CIA's withholdings pursuant to exemption one.  (Shiner Decl. ¶¶ 13–32.)  Because the FBI specifically identifies the single document it withholds pursuant to exemption one, Cox-123, Hardy's oversight would not, on its own, prevent the Court from conducting the required *de novo* review of the exemption one withholdings, so long as the CIA provided an adequate accounting of the documents it withheld pursuant to this exemption.  (Hardy Decl. ¶ 34.)  However, nowhere in the CIA's *Vaughn* affidavit does it specifically list the documents it is withholding pursuant to exemption one.

Instead, the CIA's *Vaughn* affidavit states that pursuant to exemption one it withheld classified information related to:

46

> (i) personnel associated with the former detention and interrogation program; (ii) the locations of covert Agency facilities, including former detention centers located abroad; (iii) information pertaining to specific intelligence activities, methods, and operations, including certain counterterrorism techniques; (iv) code words and pseudonyms; (v) classification and dissemination control markings; and (vi) relationships with foreign liaison partners.

(Shiner Decl. ¶ 15.)  Shiner goes on to describe each of these categories in detail, and in some cases, cite, apparently as an example, a document from which information was withheld pursuant to that category.  (*See, e.g.*, *id.* ¶ 19 (explaining the basis for withholding information relating to field installations and citing Cox-110–122 as an example of such withholding).)  But Shiner cites no documents withheld as related to other categories of classified information, such as "code words and pseudonyms," despite the fact that, according the Agencies' briefs, the CIA withheld documents pursuant to exemption one because they contained information related to these topics.  (Shiner Decl. ¶¶ 26–27 (explaining the basis for withholding unspecified "information . . . consist[ing] of code words and pseudonyms"); Reply at 28 (noting that Cox-110–122 "includes information about . . . codewords").)  In addition to not identifying the bases upon which each record was withheld, the CIA's *Vaughn* affidavit omits discussion of some records withheld pursuant to exemption one altogether.  Cox notes, for instance, that the CIA's affidavit fails to even mention Cox-30 in its affidavit, despite the fact it withheld information on this document pursuant to exemption one (as well as other exemptions).  (Opp. at 31, Ex. R; Shiner Decl.)

The problem with the FBI and CIA *Vaughn* affidavits is apparent from the Agencies' briefing.  In response to Cox's challenges, the Agencies provide additional information in their reply brief to support these withholdings pursuant to exemption one.  For instance, after Cox notes that the CIA fails to discuss its withholding of information in Cox-30, the Agencies inform the Court that Cox-30 contains the name of a covert officer.  (Reply at 29.)  Then, as part of their response to Cox's argument that it is implausible that Cox-110–122 in fact contained information

47

about the location of CIA detention facilities, the agencies state that the document in fact contains information related to *four* categories of classified information – "location of covert facilities[,] codewords[,] relationships with foreign liaison partners, and information regarding specific intelligence activities" –  and that Cox only identifies one category as questionable. (Reply at 28–29; Opp. at 30.)  While the Agencies present a reasonable explanation as to why Cox-110–122 *would* contain information about the location of detention facilities, (Reply at 29), this explanation is largely beside the point.  The information necessary for Cox to challenge the agencies' withholdings or for the Court to perform *de novo* review of those withholdings must present in an agency's *Vaughn* affidavit – not provided by counsel in an agency's reply brief. *Halpern*, 181 F.3d at 293.

   While agency affidavits are entitled to a presumption of good faith – especially so in the national security context – these presumptions do not require a court to give the benefit of the doubt to attestations never made.  *See Carney*, 19 F.3d at 812; *Am. Civil Liberties Union*, 435 F. Supp. 3d at 554.  It is the FBI's burden to provide "fact-specific justification[s]" for its withholdings "that either (a) would permit [the FOIA litigant] to contest the affidavit in adversarial fashion, or (b) would permit a reviewing court to engage in effective *de novo* review of the [withheld] information."  *Halpern*, 181 F.3d at 293.  So long as the FBI and CIA *Vaughn* affidavits fail to identify all of the records the FBI withheld, and the CIA only vaguely states that it withheld documents because they contained information related to one (or more) of six specified topics, (Shiner Decl. ¶ 15), Cox cannot meaningfully challenge the FBI's exemption one withholdings and the Court cannot meaningfully review them.  In *Halpern*, the Second Circuit advised that the government may use "generalized justifications for certain types of redactions" under exemption one, but those "generalized descriptions must accompany, and not

48

substitute for, particularized descriptions of the context surrounding each of the individual redactions and/or documents." *Halpern*, 181 F.3d at 294.  Here, the *Vaughn* affidavits supporting the FBI's withholdings under exemption one fall short of this standard.  The CIA and FBI's omission of "fact-specific justification[s]" for the withheld information prevents Cox from "contest[ing] the affidavit in adversarial fashion" and prevents the Court from "engag[ing] in effective *de novo* review." *Halpern*, 181 F.3d at 293.  Accordingly, the Court denies summary judgment with respect to the FBI's exemption one withholdings without prejudice.

Although the Court denies summary judgment with respect to the FBI's exemption one withholdings at this time, the Court also declines Cox's request to engage in *in camera* review of Cox-30, or any other documents withheld pursuant to exemption one.  Instead, the CIA and FBI are directed to supplement their *Vaughn* submissions regarding the FBI's withholding pursuant to exemption one of documents responsive to Cox's FOIA request.  *See Seife*, 298 F. Supp. 3d at 630 (explaining that a "court should first offer the agency the opportunity to demonstrate, through detailed affidavits and oral testimony, that the withheld information is clearly exempt and contains no segregable, nonexempt portions.").  The FBI may renew its motion for summary judgment based on these supplemental *Vaughn* submissions if it chooses to do so.

### C.    Exemption Five Withholdings

FOIA exemption five exempts from disclosure matters that are "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  "The exemption incorporates all normal civil discovery privileges, including the deliberative process privilege, the attorney-client privilege, and the attorney work product privilege." *Nat'l Day Laborer Org. Network v. U.S.*

*Immigration & Customs Enf't Agency*, 811 F. Supp. 2d 713, 734–35 (S.D.N.Y. 2011) (quotation

marks omitted), *amended on reconsideration* (Aug. 8, 2011).

All of the agencies withheld records pursuant to exemption five.  Cox argues that the

Agencies' declarations fail to provide adequate justification for the records withheld pursuant to

this exemption.  (Opp. at 32.)  With respect to only the FBI's exemption five withholdings, the

Court agrees.

### 1.   Exemption Five Withholdings by the FBI

As an example of his objection to the Agencies' justifications for their exemption five

withholdings, Cox cites the handwritten notes discussed above: Cox-110–122.  It appears that

both the FBI and CIA claim that these notes can be withheld pursuant to exemption five based on

the deliberative process privilege, (Hardy Decl. ¶ 49; Shiner Decl. ¶ 11), but, Cox argues, the

FBI makes "no attempt at meaningfully connecting these records" to the standard for such a

withholding and also appears to have failed to segregate and release factual material contained

within the notes.  (Opp. at 32.)

The "deliberative process privilege" is a "sub-species of work-product privilege that

covers documents reflecting advisory opinions, recommendations and deliberations comprising

part of a process by which governmental decisions and policies are formulated."  *Tigue v. U.S.*

*Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002) (internal quotation marks and citations omitted).

The purpose of the privilege is to protect candid intra-agency and inter-agency communication

that might be stifled if communications were subject to public disclosure.  *See Dep't of Interior*

*v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) ("The deliberative process

privilege rests on the obvious realization that officials will not communicate candidly among

themselves if each remark is a potential item of discovery and front page news, and its object is

to enhance 'the quality of agency decisions,' by protecting open and frank discussion among those who make them within the Government." (citations omitted) (quoting *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975))).

Although it appears that both the CIA and the FBI sought to withhold Cox-110–122 pursuant to the exemption five deliberative process privilege, (Hardy Decl. ¶ 49; Shiner Decl. ¶ 11), the Court is left to infer this fact.  In describing the basis for the CIA's withholdings pursuant to the exemption five deliberative process privilege, Shiner does not identify Cox-110–122 specifically as a document withheld.  (Shiner Decl. ¶¶ 39–40.)  Instead, after explaining that the CIA withheld documents "regarding the deliberations over the eventual public release of certain information in the Executive Summary of the SSCI Report," Shiner briefly mentions the withholding of "two non-email documents . . . related to these deliberations," one of which she identifies as Cox-110–122 and describes as "handwritten notes from the review of a draft version of the Executive Summary."  (Shiner Decl. ¶ 11.)

The FBI's affidavit adds little to the justification for withholding these notes.  The FBI's *Vaughn* affidavit includes a single paragraph to justify its withholdings pursuant to the exemption five deliberative process privilege followed by a footnote identifying – by the Court's count – 63 pages of records withheld in full or in part pursuant to the exemption.  (Hardy Decl. ¶ 49.)  The sum of the FBI's substantive justification for its withholding of Cox-110–122 pursuant to exemption five is as follows:

> The FBI relied on Exemption 5 and the deliberative process privilege to protect deliberations between FBI employees concerning information that was in draft form (working copies of the SSCI report), and handwritten notes and communications between FBI employees discussing these drafts and discussions, recommendations, and proposals for how FBI equities should be presented and/or protected within the final report.

(*Id.* ¶ 49.)  The FBI does not even provide a basis for the Court to conclude that the "handwritten notes" referred to in this paragraph are Cox-110–122.  The Agencies assure the Court this is the case in their reply brief, but that link is not established in the FBI's *Vaughn* affidavit.  (Reply at 30.)

The FBI not only fails to provide a detailed basis for its exemption five withholdings, but at times wholly fails to justify its decision to withhold documents in full.  The Court is obligated to make specific findings that the Agencies properly segregated and released non-exempt material.  *See Color of Change*, 325 F. Supp. 3d at 455.  In addition to challenging the limited support for Cox-110–122 and other documents being subject to the deliberative process privilege, Cox also challenges the decision to withhold Cox-110–122 in full.  Cox reasonably argues that "such 'handwritten notes' likely contain 'factual material' such as notes on the content of the [SSCI Report] itself."  (Opp. at 32.)  In contrast to this reasonable basis for doubting that these handwritten notes contain no segregable information, Shiner and Hardy provide only rote assurances that they have released all segregable material in the documents withheld.  (Shiner Decl. ¶ 40, Hardy Decl. ¶ 70.)  The Agencies are entitled to a presumption that they have adequately disclosed segregable material, but Cox specifically rebuts that presumption here – and the Agencies present no further basis upon which the Court could conclude they have released all segregable, non-exempt information withheld pursuant to exemption five.  *See Sussman*, 494 F.3d at 1117.

In sum, the Court concludes that the FBI has failed to provide *Vaughn* affidavits of reasonable specificity to support each record withheld pursuant to exemption five, *see Grand Cent. P'ship, Inc.*, 166 F.3d at 478, and has failed to present evidence to support a finding that it has released all segregable, non-exempt information in the records withheld pursuant to

exemption five, *see Hopkins*, 929 F.2d at 85.  Accordingly, the FBI's motion for summary judgment with respect to its exemption five withholdings is denied without prejudice to renewal.

Instead of conducting *in camera* review, the Court orders the FBI and CIA to supplement their *Vaughn* affidavits consistent with this Order.  *See Seife*, 298 F. Supp. 3d at 630 (explaining that a "court should first offer the agency the opportunity to demonstrate, through detailed affidavits and oral testimony, that the withheld information is clearly exempt and contains no segregable, nonexempt portions.").  The problems identified above are not isolated to the FBI and CIA's basis for withholding Cox-110–122, or merely to the exemption five withholdings pursuant to the deliberative process privilege – they are in large part the same problems identified above with respect to the *Vaughn* affidavits in support of the FBI's exemption one withholdings.  Accordingly, the FBI and CIA are directed to supplement their *Vaughn* submissions to adequately support the withholding of each record withheld pursuant to exemption five, and to support the conclusion that they released all reasonably segregable information in the records withheld.

### 2.   Exemption Five Withholdings by the Remaining Agencies

Cox presents no argument that any particular record withheld by the remaining four agencies was not properly withheld pursuant to exemption five.  Instead, Cox challenges the documents withheld by the Agencies pursuant to exemption five as attorney-client privileged and seeks *in camera* review of a selection of documents because "publicly available facts suggest that advice from attorneys led to, and attorneys themselves may have been involved in, the unlawful disposal of records."  (Opp. at 32.)

All of the Agencies except ODNI withheld documents pursuant to exemption five based on attorney-client privilege.  "Courts have construed Exemption 5 as covering materials

protected by the attorney-client privilege and, in doing so, have assumed that such a privilege attaches when the attorney is a government lawyer and the client a government entity." *In re Grand Jury Investigation*, 399 F.3d 527, 533 (2d Cir. 2005). Cox argues that because these documents may not be subject to exemption five if the crime-fraud exception applies, the Court should review "some responsive records *in camera* in order for the Court to determine *de novo*, as FOIA provides, whether [exemption five] properly applies or whether the smell of smoke indicates fire." (Opp. at 32.) Cox argues based on "publicly available facts" that this case may "present[] a rare situation" where attorney-client communications may not be properly withheld pursuant to exception five because the communications were made in furtherance a crime or fraud. (Opp. at 32.)

Cox points to two instances where he asserts that attorney-client privileged communications may have been in furtherance of a crime or fraud. First, Cox states that he has reason to believe guidance provided by DOJ attorneys to the CIA in December 2014 may have included advice to improperly dispose of SSCI Report copies during the pendency of *American Civil Liberties Union v. C.I.A.*, 105 F. Supp. 3d 35 (D.D.C. 2015), *aff'd*, 823 F.3d 655 (D.C. Cir. 2016). (Opp. at 33–35.) In support of this claim, he points to, among other documents, emails from SSCI staff to CIA officials stating that *they* have reason to believe that DOJ provided guidance to the CIA Inspector General about disposal of the SSCI Report, (Opp., Ex. S), as well as emails apparently related to the deletion of the SSCI Report, (*id.*, Ex. T), and emails suggesting that counsel for the CIA Inspector General advised deleting a copy of the SSCI Report, (*id.*, Exs. U, V).

Second, Cox claims that DOJ may have provided additional guidance in 2017 to the Agencies that resulted in the Agencies "intentionally alienating" their copies of the SSCI Report

54

in response to a demand that copies of the SSCI Report to be returned to the SSCI by Senator

Burr, then Chairman of the SSCI.  (Opp. at 35–37, Ex. X.)  Cox argues that this decision by the

Agencies to return their copies of the SSCI Report violated their obligations under FOIA and

federal records laws.  (*Id.* at 36–37.)  In light of his concerns about DOJ's guidance, Cox

requests that the Court review a sample of the records withheld by the Agencies pursuant to

exemption five which appear to relate to the DOJ guidance in question.  (Opp. at 38–39.)  Cox

requests that the Court review particular email chains involving the DOJ, the State Department,

and the CIA that were withheld by the DOD as attorney-client privileged.  (Opp. at 38–39;

Herrington Decl. ¶¶ 13–14.)  Cox also requests that the Court review documents withheld by the

State Department as attorney-client privileged.  (Opp. at 39; Stein Decl., Ex. A ("State

Department Vaughn Index") at 32–36.)

"It is indisputable that communications made in furtherance of an ongoing crime are not

protected by the attorney-client privilege."  *In re John Doe Corp.*, 675 F.2d 482, 491 (2d Cir.

1982).  However, as the Second Circuit has explained,

> [T]he crime-fraud exception does not apply simply because privileged
> communications would provide an adversary with evidence of a crime or fraud. If
> it did, the privilege would be virtually worthless because a client could not freely
> give, or an attorney request, evidence that might support a finding of culpability.
> Instead, the exception applies only when the court determines that the client
> communication or attorney work product in question was itself in furtherance of
> the crime or fraud.

*In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995).  Moreover, as the Agencies note, the law

is unsettled as to whether the crime-fraud exception applies to FOIA exemption five in the first

place.[7]  (Reply at 30–31.)  *See, e.g.*, *Sorin v. U.S. Dep't of Justice*, 280 F. Supp. 3d 550, 563 n.5

---

[7] The Supreme Court has previously held that an exception to a privilege rule did not apply when determining
whether documents are subject to FOIA exemption five.  *See F.T.C. v. Grolier Inc.*, 462 U.S. 19 (1983).  In *Grolier*,
the Court held that the "substantial need" exception to the work-product doctrine was not applicable in determining
whether documents were properly withheld as work product under exemption five.  *Id.* at 28.  The Court reasoned

(S.D.N.Y. 2017) ("To the extent Sorin's brief could be construed as suggesting that the crime/fraud exception should apply, it is unclear whether a court construing FOIA could properly order disclosure based on the applicability of that exception."), *aff'd sub nom. Sorin v. United States Dep't of Justice*, 758 F. App'x 28 (2d Cir. 2018).

The Court need not address whether the crime-fraud exception applies to exemption five because Cox has not met his burden of establishing that review of these documents would reveal evidence that the communications were made in furtherance of criminal or fraudulent activity. The Court is conscious of the fact that its review at this stage of the litigation is *de novo*, and as a result, Cox should not be obliged to make a substantial showing with respect to the application of the crime-fraud exception before the Court reviews the Agencies' documents *in camera*. At the same time, Cox is challenging the propriety of the Agencies' withholdings pursuant to exemption five, and under the Second Circuit's "restrained approach," Cox must make *some* showing of "contrary evidence" or that is "suggestive of bad faith" by the Agencies before the Court

---

that exemption five was meant to apply to "discrete categor[ies]" of documents which are "not 'routinely' or 'normally' available to parties in litigation," and that importing an exception to the work-product doctrine would undercut Congress's intent to create "'workable' rules." *Id.* at 27; *see also Sears, Roebuck & Co.*, 421 U.S. at 149 n.16 ("The ability of a private litigant to override a privilege claim set up by the Government, with respect to an otherwise disclosable document, may itself turn on the extent of the litigant's need in the context of the facts of his particular case; or on the nature of the case. However, it is not sensible to construe an Act to require disclosure of any document which would be disclosed in the hypothetical litigation in which the private party's claim is the most compelling. Indeed, the House Report says that Exemption 5 was intended to permit disclosure of those intra-agency memoranda which would 'routinely be disclosed' in private litigation, and we accept this as the law." (citations omitted)). At least one court in this Circuit has expressed the opinion, without so holding, that the crime-fraud exception would apply to FOIA exemption five. *See Nat'l Immigration Project of Nat. Lawyers Guild v. U.S. Dep't of Homeland Sec.*, No. 11-CV-3235 (JSR), 2014 WL 6850977, at *5 (S.D.N.Y. Dec. 3, 2014) ("Given Congress's intent in enacting FOIA to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny, it is utterly implausible to suppose that Congress intended FOIA Exemption 5 to shield government documents when they were created for the purpose of furthering a crime or a fraud."); *but see Raytheon Aircraft Co. v. U.S. Army Corps of Engineers*, 183 F. Supp. 2d 1280, 1292 (D. Kan. 2001) (stating that it "appears that [the crime-fraud] exception would not apply in the FOIA context because [documents subject to the exception] would not be 'normally' disclosed").

conducts *in camera* review to test that the Agencies properly withheld these documents pursuant to exemption five.[8]  *See Halpern*, 181 F.3d at 292.

Cox fails to make any showing suggesting the existence of a crime or fraud related to 2014 DOJ guidance to the CIA.  In his opposition brief, Cox concedes that "[w]hether DOJ directly advised CIA or Defendants to make such deletions is not clear from the limited information available."  (Opp. at 34.)  Cox provides some evidence – largely based on an unsubstantiated Yahoo News Report – that the DOJ provided legal guidance of some sort to the CIA prior to the deletion of the SSCI Report.  (*See* Opp., Exs. S, W.)  Yet this is not evidence that the DOJ's guidance was related to the CIA's decision to delete these documents – let alone evidence that this guidance was "itself in furtherance of [a] crime or fraud."  *In re Richard Roe, Inc.*, 68 F.3d at 40.  Accordingly, Cox has not made a showing of "contrary evidence" or "bad faith" on the part of the Agencies to support *in camera* review of these documents.  *See Halpern*, 181 F.3d at 292.

With respect to the DOJ's 2017 guidance in response to Senator Burr's request for records, the Court finds that Cox fails to make a showing sufficient to justify *in camera* review. First, Cox cites to no evidence establishing that the Agencies made this decision based on DOJ guidance – or that DOJ issued guidance in the first place.  (*See* Opp., Ex. X.)  But even if Cox were to establish this fact, he must do more than establish a disagreement about the legality of agency guidance to justify *in camera* review.  Cox and the DOJ plainly disagree about the Agencies' obligations to retain documents under FOIA as well as under federal record-keeping laws when Congress asks for documents to be returned.  (*See* Reply at 34–35; Sur-Reply at 9–

---

[8] To conclude otherwise would permit a FOIA litigant's unsupported claim that agency guidance was contrary to law, or that an agency issued guidance resulting in actions contrary to law, to be sufficient for a Court to conduct *in camera* review of attorney-client privileged documents in any FOIA case.  Such a policy would run contrary Congress's "intent to provide 'workable' rules" for the administration of FOIA.  *Grolier*, 462 U.S. at 27.

11.)  But if there in fact is a crime-fraud exception to exemption five, it must mean more than an entitlement to see legal guidance with which one disagrees.  For the Court to review these documents *in camera* based on a concern that the crime-fraud exception applies, Cox must make some initial showing that an agency's request for guidance, or the guidance provided, was "*itself in furtherance*" of the crime or fraud he claims occurred.  *In re Richard Roe, Inc.*, 68 F.3d at 40 (emphasis added).  Cox makes no such showing here.  Accordingly, his request for *in camera* review is denied.

Upon review of the *Vaughn* submissions from the DOJ, DOD, ODNI, and State Department, the Court finds that the Agencies carry their burden of establishing proper withholding of documents pursuant to FOIA exemption five, including the release of all segregable non-exempt information.  *See* 5 U.S.C. § 552(a)(4)(B).  The affidavits "demonstrate that the information withheld logically falls within the claimed exemption," they "are not controverted by either contrary evidence in the record nor by evidence of agency bad faith," and ultimately, appear "logical or plausible."  *Wilner*, 592 F.3d at 70.  Accordingly, DOJ, DOD, ODNI, and the State Department are entitled to summary judgment with respect to their exemption five withholdings.

## CONCLUSION

For the reasons set forth herein, the Agencies' motion to dismiss is denied, and the Agencies' motion for summary judgment is granted in part and denied in part.  Specifically, DOJ is granted summary judgment with respect to their withholding of records in response to Cox's requests numbered five through eight; DOD is granted summary judgment with respect to their withholding of records in response to Cox's requests numbered five through seven; ODNI is granted summary judgment with respect to their withholding of records in response to Cox's

requests numbered four and five; and the State Department is granted summary judgment with respect to their withholding of records in response to Cox's requests numbered four through six. The FBI's motion for summary judgment is denied without prejudice, and it is directed to supplement its *Vaughn* submissions in accordance with this Order.

This matter is recommitted to Magistrate Judge Roanne L. Mann for all remaining pre-trial matters.

SO ORDERED.

Dated: Brooklyn, New York
   November 26, 2020

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge